Law Office of Peter D. Hoffman, P.C.
Peter D. Hoffman (PH -8306)
Yifei He (YH -9382)
Attorneys for Plaintiffs
200 Katonah Avenue
Katonah, NY 10536
(914) 232-2242          Phone
(914) 232-2245          Facsimile
yh@pdhoffmanlaw.com E-mail

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **H.B. and T.B., individually and O/B/O B.B.** [1] | |
| **Plaintiffs,** | |
| - against - | **15 CIV. 05742 (VB)** |
| **BYRAM HILLS CENTRAL SCHOOL DISTRICT,** | **ORAL ARGUMENT REQUESTED** |
| **Defendant.** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANT'S**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

[1]Plaintiffs are not expressly named herein by their given names because of the privacy guarantees provided in the IDEA statute, as well as in the Family Educational Rights Privacy Act, 20 U.S.C. 1232(g) and 34 C.F.R. 99 (hereinafter "FERPA"). All student parties and actors herein are listed by pseudonym. This is done to protect their privacy pursuant to and in the spirit of FERPA. Whereas this action will require the inspection of student records of all student parties herein, Plaintiffs herein seek to protect the identity of all listed student parties by using pseudonyms.

# TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT……………………………………………………...1

II.  STATEMENT OF FACTS……………………………………………………………1

III.  STANDARD OF REVIEW……………………………………………………………...1

    A. DECISION OF THE IMPARTIAL HEARING OFFICERS IS NOT
       ENTITLED TO DEFERNCE…………………………………………………………1

    B. THE STATE REVIEW OFFICER'S DECISION IS NOT ENTITLED TO
       DEFERENCE……………………………………………………………………3

       1.  The Creation of the Hearing Record was not Reliable……………………3

       2.  The SRO was the Subject of Several Lawsuits……………………………4

       3.  The CSE's, the IHO's and the SRO's Refusal to Address CPS Issues……5

       4.  The Administrative Officers Failed to Consider the other Two Prongs
          Of the *Burlington* Test……………………………………………………6

IV.  ARGUMENT

    POINT I:    THE SCHOOL DISTRICT DID NOT PROVIDE BB WITH A
               FREE APPROPRIATE PUBLIC EDUCATION FOR THE
               2011-2012 AND 2012-2013 SCHOOL YEARS………………….7

       A. The Evidence Demonstrates that the Program Developed by the
          CSE for BB for the 2011-12 School Year was Not Appropriate
          To Meet his Individual Needs…………………………………………7

       B. The Evidence Demonstrates that the Program Developed by the CSE
          for BB for the 2012-13 School Year was Not Appropriate to
          Meet his Individualized Needs…………………………………………14

    POINT II:    GOW WAS THE APPROPRIATE PROGRAM FOR BB
               DURING THE 2011-2013 SCHOOL YEARS…………………16

       A. Gow Addresses BB's Individual Needs……………………………17

i

     B. BB Made Educational Progress to the Two Years he Attended

      Gow…………………………………………………………………..18

     C. Gow Satisfies the Least Restrictive Environment ("LRE") Provisions

      of IDEA……………………………………………………………20

   POINT III:  THE EQUITIES FAVOR PLAINTIFFS…………………………...21

   POINT IV:  PARENT'S SPOLIATION ARGUMENT IS RELEVANT……..22

V.  CONCLUSION……………………………………………………………………23

# TABLE OF AUTHORITIES

*A.C. ex rel. M.C. v. Board of Educ. of Chappaqua Cent. Sch. Dist.*,
553 F. 3d 165 (2d Cir. 2009)……………………………………………………………....7

*A.C., et al. v. Shelby County Bd. of Educ.*,
711 F. 3d 687 (6th Cir. 2013)……………………………………………………………...5

*A.D. v. New York City Dep't of Educ.*,
2013 U.S. Dist. LEXIS 38757, 17 (S.D.N.Y. 2013)…………………………………….8-9

*Arlington Central School District v. D.K. and K.K. obo C.K.*,
2002 U.S. Dist. LEXIS 21849, 27 (S.D.N.Y. 2002)…………………………………...…11

*Board of Educ. of the Hendrick Hudson Central School District v. Rowley*,
458 U.S. 176 (1982)……………………………………………………………………..9, 16

*Cerra v. Pawling Central School Dist.*,
427 F. 3d 186 (2d Cir. 2005)……………………………………………………………9

*C.L. v. Scarsdale Union Free Sch. Dist.*,
744 F. 3d 826 (2d Cir. 2014)……………………………………………………………1

*County School Board of Henrico County, Virginia v. Z.P.*,
399 F. 3d 298 (4th Cir. 2005)……………………………………………………………11

*E.S. et al. v. Katonah Lewisboro Central School District*,
742 F. Supp. 2d 439 (S.D.N.Y. 2010)
*aff'd* 2012 U.S. App. LEXIS 13811 (2d Cir. 2012)……………………………………...16

*Evans v. Board of Educ. of Rhinebeck Cent. Sch. Dist.*,
930 F. Supp. 83 (S.D.N.Y. 1996)……………………………………………………….6

*Frank G. v. Board of Educ.*,
459 F. 3d 356 (2d Cir. 2006)…………………………………………………………..16

*Gagliardo v. Arlington Central School District*,
489 F. 3d 105 (2d Cir. 2007)…………………………………………………………..16

*H.B., et al. v. BHUFSD*,
14-cv-0338 (CS)……………………………………………………………………….5, 14

*H.B., et al. v. BHUFSD*,
14-cv-03843(KMK)……………………………………………………………………4

*H.B., et al. v. BHUFSD,*
    14-cv-06796(VB)…………………………………………………………………………..4

*L.B., et al. v. KLUFSD,*
    14-cv-06805 (KMK)…………………………………………………………………………...4

*L.K. v. Dep't of Educ. of the City of NY,*
    2010 U.S. Dist. LEXIS 139638, 2011 WL 127063, 11 (E.D.N.Y. 2010)………………....9

*Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,*
    397 F. 3d 77, 83 n.3 (2d Cir. 2005)………………………………………………………..1

*M.A., et al. v. PUFSD,*
    14-cv-03846 (KMK)…………………………………………………………………………4

*M.H. and E.K. v. NYC Dep't of Educ.,*
    685 F.3d 217 (2d Cir. 2012)………………………………………………………………6

*M.N. v. KLUSD,*
    14-cv-03845 (KMK)…………………………………………………………………………4

*Mrs. B. v. Milford Bd. of Educ.,*
    103 F. 3d 1114 (2d Cir. 1997)……………………………………………………………20

*M.S. v. Yonkers Bd. of Educ.,*
    231 F. 3d 96 (2d Cir. 2000)…………………………………………………………..16-17

*Ojai Unified Sch. Dist. v. Jackson,*
    4 F. 3d 1467 (9th Cir. 1993)………………………………………………………………7

*R.B. et al. v. NYC Dep't. of Educ.,*
    713 F. Supp. 2d 235 (S.D.N.Y. 2009)…………………………………………………...21

*R.E. v. New York City Dep't of Educ.,*
    694 F. 3d 167 (2d Cir. 2012)………………………………………………………………7

*School Committee of the Town of Burlington Massachusetts v. Department of Education of*
    *the Commonwealth of Massachusetts,*
    471 U.S. 359 (1996)…………………………………………………………………...3, 6, 22

*Seattle Sch. Dist.,*
    82 F. 3d 1500……………………………………………………………………………….20

*Somoza v. New York Dept. of Educ.,*
    475 F. Supp. 2d 373 (S.D.N.Y. 2007)…………………………………………………...14

*S.W., et al. v. NYC Dep't of Educ.*,
    646 F. Supp. 2d 346 (S.D.N.Y. 2009)…………………………………………………………..21

*T.K. and S.K. v. NYCDOE*,
    N.Y.L.J. 1202747574678, 1 (2d Cir. 2016)………………………………………………….5

*Walczak v. Florida Union Free School Dist.*,
    142 F. 3d 119 (2d Cir. 1998)…………………………………………………3, 4, 6, 16, 20

*Warren G. v. Cumberland County School District*,
    190 F. 3d 80 (3d Cir. 1999)……………………………………………………………………20

*West v. Goodyear Tire & Rubber Co.*,
    167 F. 3d 776 (2d Cir. 1999)…………………………………………………………………..22

*Weixel v. Bd. of Educ. of NY*,
    287 F. 3d 138 (2d Cir. 2002)……………………………………………………………………5

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*,
    550 U.S. 516 (2007)…………………………………………………………………………...22

## ***Statutes***

8 N.Y.C.R.R. §185.12, Appendix I [Schedule ED-1] …………………………………………..22

8 N.Y.C.R.R. §200.22……………………………………………………………………………..8

8 N.Y.C.R.R. §200.22(b)(2)……………………………………………………………………….7

8 N.Y.C.R.R. §200.4(b)(v)………………………………………………………………………...7

8 N.Y.C.R.R. §200.4(d)(2)(v)……………………………………………………………………10

8 N.Y.C.R.R. §200.5(5)(vi)……………………………………………………………………...23

8 N.Y.C.R.R. §200.5(j)(3)…………………………………………………………………………3

8 N.Y.C.R.R. §200.5(j)(3)(v)……………………………………………………………………23

8 N.Y.C.R.R. §200.5(j)(5)……………………………………………………………………...2, 8

8 N.Y.C.R.R. §279.2(a)………………………………………………………………………….23

8 N.Y.C.R.R. §279.9……………………………………………………………………………..23

20 U.S.C. §1415(b)(1)………………………………………………………………………...9, 14

20 U.S.C. §1415(b)(3)(B)…………………………………………………………………………9

34 C.F.R. §300.320(a)(4)(2006)…………………………………………………………………………10

## I.    PRELIMINARY STATEMENT

This memorandum of law is in opposition to Defendant's Motion for Summary Judgment. To avoid duplication, Plaintiffs respectfully refer the Court to page one of their Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment.[1]

## II.    STATEMENT OF FACTS

To avoid duplication, Plaintiffs respectfully refer the Court to the administrative record and their Statement of Uncontroverted Facts[2] submitted with Plaintiff's Motion for Summary Judgment pursuant to Local Rule 56.1 for a full recitation of the facts relevant to this motion. This Court is also respectfully referred to Plaintiffs' Response and Counterstatement to Defendant's Statement of Uncontroverted Facts, which is being filed contemporaneously with this memorandum of law.

## III.    STANDARD OF REVIEW

Although Defendant is correct that deference should be paid to the findings and decision of the state educational agencies, *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837-838 (2d Cir. 2014), Courts must refrain from deferring to the SRO on matters of law. *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005). Furthermore, the Administrative Proceedings have been flawed at every stage:

### A.    DECISION OF THE IMPARTIAL HEARING OFFICERS IS NOT ENTITLED TO DEFERENCE

The Impartial Hearing in this matter was deeply flawed and did not allow for due process intended by IDEA. Although the Parties representing BB brought a complaint in January of

---

[1] Plaintiffs' Memorandum of Law in Support of Summary judgment is hereinafter referred to as "P MSJ MOL" followed by the page number; Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of its Cross-Motion for Summary Judgment is hereinafter referred to as "D MSJ MOL" followed by the page number.

[2] Plaintiff's Statement of Uncontroverted Facts is hereinafter referred to as "PSUF" followed by paragraph number; Plaintiff's Response and Counterstatement to Defendant's Statement of Uncontroverted Facts is hereinafter referred to as "Counterstatement" followed by the page and paragraph numbers.

2013, the IHO failed to render a decision until October 2014. This is well over statutory limits. 8 NYCRR 2005(j)(5). This decision was rendered by the fourth IHO appointed to the case.

The original IHO, Dolores Freed, was not competent to handle a hearing and any record created from this hearing is inherently suspect. The Plaintiffs' Application to Revoke IHO Freed's Certification was unopposed by the Defendants.[3] The unopposed and uncontroverted Application to Revoke IHO Freed's Certification, pp. 4-7, stated that IHO freed was not competent and that she stated that she was pressured by Albany. The successful Application to Revoke IHO Freed's Certification also stated in part that:

> " … as evidenced by her inability to keep track of exhibits being offered into evidence, read or tell time, hear witnesses and counsel speaking, and by her indeterminable pauses where she often failed to make rulings during the hearings. For example, the IHO stated " My eyes are acting up," when she had to be redirected to look at the correct exhibit (T:1182-1183). The IHO also had to be corrected when she read the time. She stated it was 9:45AM when in fact 9:38AM. (T:1139). When she was informed of the correct time she responded, "That's fine. I need to have my glasses checked" (T:1139). Petitioners believe that IHO Freed's difficulties with running the impartial hearing may be due, in part, to her age. Although age alone certainly does not determine one's ability to manage an impartial hearing, it may have been part of the cause for IHO Freed's difficulties in this case. Indeed, throughout the hearing process, counsel for both parties discussed whether IHO Freed was competent to conduct the impartial hearing.
> 
> Most concerning was the fact that IHO Freed did not make rulings on matters of disagreement between counsel. Upon information and belief, IHO Freed was at times unaware that the parties were waiting for her to rule on an objection. After an objection was raised, the parties' counsel would argue their points back and forth with no interjection from IHO Freed. It frequently came to a point when counsel had to ask IHO Freed if she was going to rule on the objection. At times, when asked if she was going to rule, it was apparent that IHO Freed did not understand what was going, stating that she could not hear what counsel said or asking for clarification on what the disagreement was about. On several occasions, counsel for Petitioner had to summarize and explain what the objections were in order for IHO Freed to be able to make a decision. On multiple occasions, when it was clear that IHO Freed was not able to make a ruling on the objection, counsel for Petitioner simply withdrew the question and/or rephrased the question to avoid further confusion and delay (T: 385-386,

---

3 The Application to Revoke IHO Freed's Certification as an IHO should be a part of the record forwarded to the Court by the SRO.

842, 939, 958-959, 1000, 1079, 1376, 1567, 1596). On one occasion, after counsel for Petitioner was compelled to ask IHO Freed to rule on his objection, IHO Freed stated "the objection is okay," necessitating counsel for Respondent to ask IHO Freed for clarification (T: 1376). It was clear that IHO Freed did not fully understand what was going on and was unable to actively manage the case pursuant to 8 NYCRR 200.5(j)(3)." pp. 4-6.

Plaintiffs' unopposed application to Remove IHO Freed and to have her certification as an IHO was granted. IHO 3. It is inconceivable how the fourth and deciding IHO was able to render a decision from the record in this matter and it is even harder to understand how the SRO's review of such a record could provide due process. *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119 (2d Cir. 1998).

## B. THE STATE REVIEW OFFICER'S DECISION IS NOT ENTITLED TO DEFERENCE

The circumstances in this matter do not allow for deference to the SRO for four reasons: 1) the underlying record being at best lacking any direction from the IHO who presided over the hearing and the SRO (Decision) and the fourth IHO (Decision) relying on the same, IHO 3, and supporting papers; 2) the SRO's bias as to rendering a decision that was the subject of pending litigation(s); and 3) the refusal of the CSE, the four IHOs and the SRO from discussing the impact of the District's bullying, false and malicious call to CPS on June 21, 2012 and the Parents' participation in the August 2012, CSE Meeting P NN[4] and IHO Decision, pp. 19-20, and SRO decision, p.16; [5] 4) the SRO failed to consider the other two prongs of the *Burlington* test.

### 1. The Creation of the Hearing Record was not Reliable

As seen above, IHO Freed's role in creating the record was less than appropriate or

_____

[4] P NN between four and a half minutes to eight minutes of the recording of the CSE Meeting Date August 15, 2012. Also see D 40, p 2.
[5] The fourth and deciding IHO, contemplated re opening the hearing to contemplate the issues related to the CPS call. IHO Decision pp. 19-20, fn. 5.

timely. During the hearing IHO Freed was simply not competent. IHO Freed did not have the ability to keep track of exhibits, read or tell time, hear witnesses and counsel speaking, indeterminable pauses and often failed to make rulings during the hearing, and overall, was not able to grasp any component of the hearing.

The role of the SRO is to review the record created at the Impartial Hearing in a manner that is "thorough and careful." *Walczack, et al. v. Florida Union Free School District, et al.*, 142 F.3d 119, 128, (2ⁿᵈ Cir. 1999). While counsel for both parties worked diligently in difficult circumstances, there is nothing "thorough and careful" in the record created under IHO Freed. Id.

### 2.    The SRO was the Subject of Several Lawsuits

As this Court is aware, the Plaintiffs sued the SRO in this matter, *HB, et al. v. BHUFSD and State of New York*, 14-cv-06796(VB). The Plaintiffs were compelled to litigate to get unduly and unlawfully late SRO decisions for her other son in *HB, et al. v. BHUFSD and New York State*, 14-cv-03843(KMK). In addition, counsel for the Parents was compelled to bring *Related Cases* in three other cases against the SRO. *MN v. KLUFSD and New York State*, 14-cv-03845-KMK, *LB, et al. v. KLUFSD and New York State*, 14-cv-06805-KMK, and *MA, et al. v. PUFSD and New York State*, 14-cv-03846-KMK.[6] The hearing and decision in the *Related Cases* was held on September 9, 2015, *HB, et al. v. BHUFSD and New York State*, 14-cv-03843(KMK), Dkt. No. 102.

Notwithstanding all of this ongoing litigation against SRO Bates, he rendered an opinion in this matter and in each of the other four matters. A judge should disqualify or recuse himself when the interest in the litigation(s) is this clear. New York Judiciary Law §14. At the very least, this Court should not pay deference to the SRO's decision.

---

6  The later four matters listed in the paragraph above became *Related Cases* with the Hon. Kenneth M. Karas, USDJ, presiding.

### 3. The CSE's, the IHOs' and the SRO's Refusal to Address CPS Issues

The IHO and the SRO were wrong to exclude evidence of the CPS charge in this matter. In large part, this action was tainted by a District call to CPS. This call was bullying and retaliation of the parents because they had clearly expressed their right to seek a private education at District expense. The issue of retaliation is now being litigated. *HB, et al v. BHUFSD*, 14-cv-0338. But the impact of the CPS call on the Parents and their ability to participate in the August 2012 CSE meeting was and is another form of bullying. In these circumstances the Parents were bullied by the real CPS charge and the continued threat of further baseless charges. Both BB and his brother were also victims of this bullying. BB was named as being abusive to his brother ZB D 40 and P NN.

The call itself and the conduct of the CSE meeting itself thoroughly impeded the Parents' participation in the August 2012 CSE meeting. At the CSE Meeting the Parents were not permitted to address the impact at the CSE Meeting.[7] The call to CPS is a severe and troubling action for any parent.[8] The U.S. Court of Appeals for the Second Circuit affirmed that the New public schools are liable for failing to address the "reasonable concerns" of the parents and children who are bullied. *TK and SK v. NYCDOE*, NYLJ 1202747574678, at 1 and 14 (2d Cir., Decided January 20, 2016).

Here, there is no question that the Parents and their children were bullied by the CPS call and the CSE, (as well as the IHO and the SRO), refused to address the impact of this false and malicious call as an issue in the hearing and the Parents' ability to participate in the August 2012

---

7 Please see P NN, August 15, 2012 recording at 4 minutes thirty seconds to six minutes.
8 "Having a government official appear at their door armed not only with the power to take their disabled child away but also with allegations that they are actively .... abusing that child would surely be enough to dissuade many reasonable parents from seeking accommodations at school. The type of intrusive investigation that .... officials must conduct of such parents' homes and children to complete a[n] ... investigation, .... , could be powerfully dissuasive in its own right and only cements that conclusion." *AC, et al v. Shelby County Bd. of Educ.*, 711 F.3d 687, 698, (6th Cir., 2013) (citing *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 149 (2d Cir. 2002).

CSE Meeting. This would go to prong one of the Burlington Carter analysis concerning the placement at an District program and it affects the level of cooperation by the parties and in particular the District in prong three of the Burlington Carter analysis. *School Committee of Town of Burlington, Massachusetts v. Department of Education of Massachusetts*, 471 U.S. 359, 369-371.105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Here, there was a reasonable concern on the Parent's part that they had to place BB out of district, in part because they reasonably feared continued District calls to CPS. T.K. at 14. The CSE's, the IHO's and the SRO's refusal to consider the impact of the CPS call on the Parents and their children is the antithesis of a "careful and thorough" review of this matter and accordingly this Court should not provide any deference to the IHO or the SRO. *Walczack* at 129-130.

### 4. The Administrative Officers failed to consider the other two prongs of the *Burlington* test

A state administrative finding does not merit deference unless it is "reasoned and supported by the record," *M.H. and E.K. v. NYC Dep't of Educ.,* 685 F.3d 217, 241 (2d Cir. 2012) (internal citations omitted). The SRO's findings and conclusions are also unsupported. *See Evans v. Board of Educ. of Rhinebeck Cent. Sch. Dist.,* 930 F. Supp. 83 (S.D.N.Y. 1996). Moreover, the Administrative Officers have failed to issue a "thorough and careful" decision. *Walczak,* 142 F.3d at 129.

Here, the SRO did not address the second and third prongs of the *Burlington* test,[9] and thus should not be afforded deference because the SRO's review was not "careful and thorough." *Walczak v. Florida Union Free School Dist.,* 142 F.3d 119, 129 (2d Cir. 1998). Further, the

_____

9A district may be required to reimburse parents for their expenditures for private school educational services obtained for a student by the parents, if (1) the services offered by the district were inappropriate (2) the services selected by the parent were appropriate and (3) equitable considerations support the parent's claim. *See School Committee of the Town of Burlington Massachusetts v. Department of Education of the Commonwealth of Massachusetts,* 471 U.S. 359, 370 (1996).

SRO's decision was not based on substantial evidence due to the SRO's failure to credit

significant evidence established by Plaintiffs at the Impartial Hearing. The SRO was wrong on

the merits and largely ignored substantial evidence in the form of the testimony by Plaintiffs'

witnesses and exhibits. Furthermore, the SRO unduly credited the IHO's findings. As such,

Plaintiffs respectfully request that this Court reject the findings of the SRO "in whole," *Ojai*

*Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1473-1474 (9th Cir. 1993).

## IV.  ARGUMENT

### POINT I: THE SCHOOL DISTRICT DID NOT PROVIDE BB WITH A FREE APPROPRIATE PUBLIC EDUCATION FOR THE 2011-2012 AND 2012-2013 SCHOOL YEARS

#### A.  The Evidence Demonstrates that the Program Developed by the CSE for BB for the 2011-12 School Year was Not Appropriate to Meet his Individualized Needs.

The weight of the evidence in the hearing record supports Plaintiffs' contention that the

Program Developed by the CSE for BB for the 2011-12 School Year was Not Appropriate to

Meet his Individualized Needs.

From the outset, BHCSD failed to conduct an appropriate FBA for BB for the 2011-12

school year amounting to a denial of FAPE. This is a serious procedural violation rising to the

level of a denial of FAPE." *A.C. ex rel. M.C. v. Board of Educ. Of Chappaqua Cent. Sch. Dist.*,

553 F.3d 165, 172 (2d Cir. 2009); *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 190 (2d

Cir. 2012); 8 NYCRR §200.22(b)(2); 8 NYCRR § 200.4(b)(v).

IHO Lucasey had previously ruled against the District because of the District's failure to

conduct a FBA for the 2010-11 School Year. IHO pp. 23-25. IHO Lucasey stated that the

District's, "complete failure to administer, or to even consider, an FBA with the aim of creating a

formal, effective behavior plan to reduce BB's interfering behaviors…" resulted in its failure to

provide a FAPE to BB. IHO pp. 25.

Indeed, BHCSD failed to provide a Functional Behavior Assessment ("FBA") and Behavior Intervention Plan ("BIP") year after year (T: 239, 1162) that actually addressed BB's interfering behaviors. In violation of 8 N.Y.C.R.R. §200.22, no BIP nor FBA was put into place to deal with BB's behavioral issues (T:606-607). The District never had a FBA done on BB and as a result, failed to have a written BIP in place. Tr. 239. Certainly, it is a stretch of logic to claim that the IEP suddenly reversed course for the 2011-12 Year. Rather, Parents aver that no FBA was ever discussed, let alone implemented by the District. There was no mention of the FBA in the comment section of the IEP. T, 1287. Rather, the same methods that had been tried and tested and proved unsuccessful for BB were being recommended again. Tr. 331, 332.

Plaintiffs assert BHCSD never intended to implement a BIP (D-13; T: 238). At the end of the 2010-11 school year, BHCSD had not begun a FBA in preparation for the 2011-12 school year, and had not asked for parental consent to do so (T: 238-39). At the time of the 2011-12 CSE meeting, nobody at BHCSD had ever mentioned a behavior plan to HB (T: 1220). There was no discussion of a FBA at the March 23, 2011 CSE, and the comments section of the 2011-2012 IEP accurately reflects this (D-13, pg. 2; T: 1287).

The IHO erred in finding Dr. Stowell's account to be more credible. IHO p. 12. It took over a year to receive IHO Lucasey's Decision. This is well over statutory limits. 8 NYCRR 2005 (j)(5). Moreover, there have been four IHOs in this case. The initial IHO was removed from her position indefinitely for her failure to complete and issue a Decision. IHO Exhibit 3. IHO Freed had difficulties keeping up with the exhibits, reading time, hearing witnesses and counsel speaking, and displayed indeterminable pauses where she often failed to make rulings during the hearings. Tr. 1182-1183, 1139. "[M]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *A.D.*, 2013 U.S. Dist.

LEXIS at * 17. *See* 20 USCS § 1415 (b)(3)(B); § 1415 (b)(1).

Additionally, the record definitively shows the 2011-12 IEP to not be reasonably calculated to confer educational benefit on BB. *See Board of Educ. of the Hendrick Hudson Central School District v. Rowley*, 458 U.S.176, 206-07 (1982); *Cerra v. Pawling Central School Dist.,* 427 F. 3d 186, 192 (2d Cir. 2005). The Supreme Court requires "that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child…the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 200-201. A valid IEP should provide that "the door of public education" is "opened for a disabled child in a 'meaningful' way." *Walczak,* 142 F.3d at 130, *quoting Rowley*, 458 U.S. at 192. "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *A.D. v. New York City Dep't of Educ.*, 2013 U.S. Dist. LEXIS 38757, *34 (S.D.N.Y. Mar. 19, 2013). The program BHCSD does use must be reasonably calculated to provide educational benefit. *L.K. v. Dep't of Educ. of the City of NY*, 2010 U.S. Dist. LEXIS 139638, 2011 WL 127063, at 11 (EDNY, 2010).

To understand how the District failed to offer BB a FAPE, the Court must have a complete understanding of the District's defaults in providing BB a FAPE in 2011-12. Defendant argues that the IEP was appropriate because it considered a counseling progress summary, an attendance report, an annual review report, and the student's report card. It also considered the results of the Slosson-Diagnostic Math Screener, the Stanford Diagnostic Reading Test, the Gates-McGinitie Reading Tests, the Stanford Diagnostic Math Test, the Diagnostic Achievement Battery, the Test

of Written Language, the Woodcock-Johnson ACH Tests, the BASC II and the Wechsler Intelligence Scale for Children, and allegedly, the concerns of the Parent. SD Exhibit 13.

Notwithstanding the District's battery of tests, BHCSD did not provide a program designed to meet BB's unique needs. BB was consistently failing every class year after year. Tr. 1216, 1290. BB was non-compliant with the Program from session one. Tr. 605-607. By seventh grade BB was only reading at a third grade reading level (T:620). Moreover, BB was not part of the social mainstream. Tr. 1284-85. The District placed BB with disabled peers with a wide spectrum of disabilities. Tr. 1285.

The IDEA, incorporating requirements under No Child Left Behind ("NCLB"), requires that a school district's recommended program and services, to the extent practicable, be based on *scientifically based or peer-reviewed research*. 34 C.F.R. 300.320(a)(4)(2006); 8 NYCRR 200.4 (d)(2)(v). The programs offered by BHCSD were not based on or evidenced by scientifically or peer-reviewed research.

The District completely failed to recognize the effect BB's dyslexia and Attention Deficit Hyperactivity Disorder ("ADHD") had on his self-esteem and motivation to learn. The IEP failed to address BB's root academic challenges affecting his behavior. Tr. 1031-32. BB's issues were never effectively addressed and it had a direct impact on BB's ability to access a FAPE.

Prior to the beginning of the 2011-12 School Year, Plaintiffs provided BHCSD with the recommendations and report of Dr. Thomas (T:1015; P-L), which were based on application of proven scientifically-based remedial strategies, for those suffering from multiple learning disabilities and ADHD. Tr. 1052-53. D 25, p. 8. PPHB 12-13. Dr. Thomas explained that BB had been largely educated in self-contained classrooms with a student to teacher ratio of 15:1 or 12:1. (D-25, p.2). These classes contained students with a wide range of disabilities and had no reading

specialist. BB did not have the assistance of a 1:1 aide in such classrooms, Dr. Thomas recommended that BB needed the most intensive comprehensive program (T:1034) and recommended 3 years of remediation in an intensive, structured, and routine program heavily oriented on language development utilizing scientifically based strategies in a highly supervised residential setting (D- 25, p. 13). Dr. Thomas stated that only a 24-hour residential center could provide the comprehensive and immersive level of support needed to ameliorate his academic failure, remediate his learning disabilities, and reconstitute his self-esteem (D-25, p. 13). This intensive residential setting was also necessary to address BB's multiple learning disabilities and significant ADHD (D-25, p.8).

Here, the District's proposed 2011-2012 programs were not at the level of Dr. Thomas' expert recommendations, D 25, p. 13. As a matter of fact, the District never even considered, let alone factored, Dr. Thomas's recommendations until nine months after the Report was provided. Tr. 1298. All this is in spite of the fact that BB was consistently failing every class year after year. Tr. 1216, 1290. Furthermore, the IEP did not explain the methodology for the multisensory reading program curriculum. Tr. 1284-85, 1277-78. The IEP failed to consider BB's social hindrance. Tr. 1281, 1284. The IEP failed to propose speech/language therapy, or a residential placement. Tr. 148. D 25. D 40.

Here, both the IHO and SRO discounted Dr. Thomas's findings. Particularly, the IHO claimed, "nothing in the record suggests that [Dr. Thomas] has the foundation of knowledge necessary to judge the appropriateness of an educational program...As Dr. Thomas cannot fairly be considered an educator as he has neither a teaching license nor any significant career experience as an instructor." (IHO 14-5). Therefore, "Parent's argument that his recommendations and conclusion be afforded deference under the standard articulated in

Arlington Central School District v. O.K. and K.K .. obo C.K., 2002 U.S. Dist. Lexis 2] 849 (S.D.N.Y. 2002) and County School Board of Henrico County, Virginia v. Z.P., 399 F.3d 298 (4th Cir. 2005) must fail" (IHO 13).

Subsequently, the SRO summarily upheld the IHO decision, ignoring Dr. Thomas' evaluations and recommendations. The SRO stated that the, "hearing record reflects that the IHO, in a well-reasoned and well-supported decision, correctly determined that the district…offered the student a FAPE for the 2011-12 and 2012-13 school years…set forth the proper legal standard to determine whether the district offered the student a FAPE and applied that standard to the facts at hand." (SRO 7-8). The SRO stated, "[b]ased on the foregoing and consistent with the findings of the IHO (see IHO Decision at pp. 11-13, 26), the March 2011 CSE developed an IEP for the 2011-12 school year that adequately addressed the student's special education needs and was reasonably calculated to address his social/emotional and behavioral needs." (SRO 13).

However, the SRO and IHO failed to consider the law correctly. In *Arlington Central School District v. O.K. and K.K .. obo C.K.*, the Court ruled that the SRO failed to meet its burden of showing the IEP was reasonably calculated to confer education benefits. 2002 U.S. Dist. Lexis 849 (S.D.N.Y. 2002). This is because although the parents presented multiple expert reports, in support of the conclusion that the IEP was not tailored to meet the student's needs, and in fact might have caused him to regress, there is nothing in the brief from the District to counter these conclusions. *Id* at p. 9.

Here, the IHO certainly cannot act as an advocate for the District in discounting Dr. Thomas's findings. Even the IHO himself stated that, Dr. Thomas's testing of BB appears to be comprehensive, accurate, and in agreement with the bulk of the other assessments that placed

BB's decoding abilities several years below grade level." (IHO 15). Ms. Cunningham, BHCSD's own school psychologist, testified that she "certainly would concur with Dr. Thomas' recommendation for a highly routinized environment (T: 766). As a matter of fact, Dr. Thomas's expert recommendations, D 25, p. 13, were based on application of proven scientifically-based remedial strategies, for those suffering from multiple learning disabilities and ADHD. Tr. 1052-53. As a result, Dr. Thomas is best suited to know nature of the placement where BB is best suited. Tr. 1089.

By contrast, the 2011-12 program offered by BHCSD did not counter Dr. Thomas's recommendations with viable solutions. Defendant, the IHO and SRO all ignore the fact that in 2011-12, the District provided the same services that had been provided to BB in previous years, which had proven unsuccessful year after year (D-13; T: 1216, 1290; IHO 23, 25; SRO 7, 13). The record shows that the same programs that had failed B.B. in the past were recommended again (D-13; PP 3).

Contrary to the IHO and SRO's conclusions, the counseling and daily multi-sensory reading program would not be effective. IHO pp. 26, SRO pp. 13. As a matter of fact, the BOCES specialist in reading assigned to work with BB was deemed to be ineffective (T:605-607; P-E). BB was and continued to be non-compliant with the District's Program from session one. (T:605-607; P-E). Moreover, Dr. Thomas specifically cautioned that, "[o]nce-a-week individual counseling…is not an appropriate modality for [BB] to gain the emotional strength he needs to re-engage in the learning process…Such a position is supported by the numerous failed psychotherapy attempts, and the latest recommendation by his most recent therapist, who indicated that an altered educational environment is the best solution to his current learning problem…" D 25, pp. 14.

In summary, BB was deprived FAPE during the 2011-12 school year and Plaintiffs should be awarded compensatory education. "[W]hereas the provision of a FAPE is a legal right provided by the IDEA, compensatory education is a judicially-crafted equitable remedy designed to make up for a denial of a FAPE that has already occurred." *Somoza v. New York City Dept. of Educ.*, 475 F. Supp. 2d 373, 390 (S.D.N.Y. 2007).

## B. The Evidence Demonstrates that the Program Developed by the CSE for BB for the 2012-13 School Year was Not Appropriate to Meet his Individualized Needs.

The IHO and SRO erred in determining that BHCSD offered B.B. a FAPE in the 2012-13 school year (IHO 28; SRO 7, 14). The 2012-13 IEP was inappropriate, as it was not reasonably calculated to confer educational benefit upon BB. Furthermore, the 2012-13 IEP was virtually unchanged from the previous years' IEPs. Tr. 1053. D 40.

From the outset, the District did not allow the Parents a meaningful opportunity to participate. 20 U.S.C. § 1415 (b)(1). The District maliciously reported Plaintiffs to the Child Protective Services. Plaintiff's retaliation action is currently pending before the District Court. Docket No. 7:14-cv-0338 (CS), Doc. No. 51.

Furthermore, the District did not follow the recommendations of Dr. Thomas or credit his opinions. Tr. 1052-53. D. 40. Dr. Thomas explained that B.B. is just at the point beyond which he may not be able to ally recover, emotionally, and cognitively, from his experience of failure. D 25, pp. 14. Dr. Thomas recommended 3 years of remediation in an intensive, structured, and routine program heavily oriented on language development utilizing scientifically based strategies in a highly supervised residential setting (D- 25, p. 13). Only a 24-hour residential center could provide the level of support needed to ameliorate his academic failure, remediate his learning disabilities, and reconstitute his self-esteem (D-25, p. 13).

It is indeed true that Dr. Thomas had no direct knowledge of Gow. Tr. 1104-05. However, Dr. Thomas knows about the nature of the placement where the child is best suited. Tr. 1089. Gow is a Program in line with Dr. Thomas's recommendations. BB's academic performance improved while at Gow. Tr. 1527-32. SD 43, pp. 38 – 43. BB went up about two grade levels with his reading and decoding skills and his memory, memorizing ability. Tr. 1527-32. BB's effort and homework participation increased and improved in every subject except Computers. SD 43, pp. 38 – 43. BB also made significant progress both socially and behaviorally. Tr. 1526.

BB's success at Gow is in stark contrast to his failing performance while at Byram Hills. Tr. 1529-30. For the 2012-13 year, there were no significant changes in terms of frequency of intervention in different services offered by the District. Tr. 1052-53. A standalone psychologist counseling once a week "is not an appropriate modality" for BB. SD 25, p. 13. Even with the addition of an aide, the Program would not come anywhere near close in terms of its function to help B.B. Tr. 1052-53.

The fact also remains that the Parents granted the District permission to observe BB at Gow on multiple instances. SD31; SD 33; SD 37. However, the District did not input any additions from the Gow curriculum. SD 40. As a matter of fact, the only addition to the 2012-13 IEP was the Flexible Support Program ("Flex"). Contrary to Defendant's suggestions, the IHO's determinations as to progress made with Flex, a program that Plaintiffs objected to, were fundamentally flawed.

The preponderance of the evidence demonstrates that the Flex program could not provide BB with educational benefits. For many years, BB had been largely educated in small, self-contained classrooms with a student to teacher ratio of 15:1 or 12:1. These classes contained students with a wide range of disabilities and had no reading specialist. BB did not have the

assistance of a 1:1 aide of reading specialists in such classrooms. The District again offered the same failing program (D-25, D-40; T: 1542). The District's aim is to pass BB along from level to level before mastery of any one subject; impeding BB's ability to acquire the basic building blocks for reading, and frustrating his ability to make meaningful progress under the District's IEP. *See Walczak,* 142 F.3d at 130, *quoting Rowley*, 458 U.S. at 192.

Indeed, Flex is not specific to special education students with BB's level of disability. Dr. Thomas specifically recommended "Brandon … be provided a program that specializes in the education of students who specifically have dyslexia and ADHD." SD 25 pp. 15. Here, BHCSD was offering an unstructured Flex program that had never been implemented before at BHCSD (D-40; T:126). This was a "crisis intervention model," only to be utilized when BB's behavior or functioning levels reached extremes and he required a calming space to address these behaviors (T: 1119-20). *See E.S.*, 742 F. Supp. 2d at 439-40. Clearly, the District's use of Flex impeded BB's ability to achieve any level of progress in reading because the program was not uniquely tailored to BB's needs.

In summary, BB was deprived FAPE during the 2012-13 school year and Plaintiffs should be awarded compensatory education.

## POINT II: GOW WAS THE APPROPROPRIATE PROGRAM FOR BB DURING THE 2011-2013 SCHOOL YEARS

Under the totality of the circumstances, the private placement at Gow was appropriate. *Gagliardo* 489 F. 3d at 112; *Frank G.* 459 F.3d at 364-65. A private placement is "reasonably calculated to enable the child to receive educational benefits," *Gagliardo*, 489 F. 3d at 112; *Frank G.* 459 F. 3d at 364, if it is "likely to produce progress, not regression." *Walczak,* 142 F.3d at 130. Here, parents seeking reimbursement bear the burden of showing their private placement was appropriate, and Plaintiffs have met that burden. *M.S. v. Yonkers Bd. of Educ.*, 231 F.3d 96,

104 (2d Cir. 2000). Gow provided BB with an educational benefit during the 2011-13 school years. The record is also replete with evidence that BB made academic and social progress at Gow and is void of any evidence that BB regressed.

### A. Gow Addressed BB's Individual Needs

Gow offers a structured academic program with an emphasis on Reconstructive Language Instruction, including Orton-Gillingham based phonics (PSUF ¶ 100-101). It provides a residential program that is oriented to BB's reading disability, a highly routinized environment, scientifically-based remedial strategies, and a program of sufficient intensity and duration, language remediation, all of which were recommended by Dr. Thomas (D-25). This environments allows students like BB the opportunity to acknowledge their disability, not feel ashamed of it, and move ahead in the treatment process (T: 747; 1043). At Gow, BB also received speech therapy from a certified speech clinician from the Buffalo Hearing and Speech Center (PSUF ¶120).

Defendant asserts that Gow's reading program was neither scientifically proven, nor taught by seasoned professionals and could not address BB's learning style. (Dkt 35 p. 15). Furthermore, Defendant claims the Reconstructive Language program, developed by the founder of Gow, has not changed at all in 85 years. Finally, Defendant claims BB's Reconstructive Language teacher his first and most crucial year at Gow was a former motor boat and insurance salesman and not possibly have the expertise to teach BB. (Dkt 35 p. 15).

In rebuttal to Defendants' wild assertions, the Gow Reconstructive Language Program has been highly effective. It has worked every single year since its inception. Tr. 1434-1435. It serves as the pillars of the foundational teaching methods of the Gow School as a phonetic-based program. Tr 1432. Furthermore, Mr. Simms has struggled himself with dyslexia, and attended the

Gow School. As a result, Mr. Simms intimately understands the educational program at Gow, ultimately as someone who succeeded within the Program. Tr. 1454. Mr. Simms also has a Masters in Education and had two summers of training at the Teacher Training Institute for Reconstructive Language. Tr. 1400. Moreover, BB did not fail to make progress in his reading abilities. As a matter of fact, BB read a variety of different literature including poetry as well as novels. SD 43, pp. 8, 10. BB went up about two grade levels with his reading skills. Tr. 1527.

Defendant further asserts Gow had no program in place to address the behavioral issues that continued to impede BB's progress while at Gow. The Gow program has no counseling component and Jeffrey Sweets headmaster at Gow testified that Gow does not even monitor behavioral issues. Defendant asserts BB's interfering behaviors has become exacerbated while at Gow. Dkt 35 p.16.

However, Defendant's statements are unsupported and contradicted by the record. The Gow School does indeed have programs to address a student's individual behavioral needs. Behavioral issues can be handled within the classroom by the individual's teacher or outside the classroom by the individual's dorm parent. Tr. 1355. Moreover, Gow has general and individualized rules to address students' behaviors. Tr. 1377. P EE. Indeed, BB's effort and homework participation increased and improved in every subject except Computers. SD 43, pp. 38 - 43. In the Final Marking Period, BB maintained focus and direction; resulting in positive work and homework production. SD 43, pp. 40, 43, 48.

### B. BB Made Educational Progress in the Two Years he Attended Gow

Defendants assert BB made no educational progress and regressed in the two years he attended Gow. (Dkt. 35, p. 21). However, the record demonstrates a substantial improvement in BB's academic performance. BB's teachers saw marked progress and observable improvement in

BB's reading, spelling, and penmanship, as well as improvement in his other classes (PSUF ¶¶ 110-111). BB made progress at Gow (P-LL). For the first time, BB was not failing, or close to failing, every subject. (T: 1530-31).

Testing completed by Gow on May 31, 2012, showed scientific proof of the progress BB had made since testing at the time of admission. At the time of admission, BB had achieved 24% correct in the non-word test. In the spring of his 8th Grade year, he achieved 45% correct. BB also improved an entire grade level in his spelling aptitude since starting at Gow, and he had risen over a grade level in his rate, accuracy, and fluency in reading (PUSF ¶ 112). Moreover, BB's effort and homework participation increased and improved in every subject except Computers. SD 43, pp. 38 – 43.

In the Final Marking Period of the 2011-12 School Year, BB earned the wide-spread praise of his teachers. BB was observed as really directing his best efforts to positive production of work. SD 43, p. 43. BB worked to maintain focus and stay on task. SD 43, p. 43. BB required far less prompts to stay on task. SD 43 p. 42. BB consistently submitted more assignments on time and made significant improvement in homework preparation. SD 43, p. 40.

For the 2012-13 School Year, BB's GPA was 2.14 for the second marking period, an improvement over the first marking period. BB worked diligently on many of his homework assignments; earning a 96% on his homework. SD 49, pp. 1. BB was also excited about and participated well in class discussions. *Id.* at 2. BB often seemed comfortable discussing topics with his classmates. *Id.*

BB's academic performance declined in the third marking period only because of his official diagnosis of clinical depression. BB was having emotional difficulties caused by the loss

of his roommate, who he spent the majority of his time with. BB also was worried and concerned about his brother, ZB and the difficulties at home. Tr. 1467-68, 1549-50, 58.

Finally, BB made significant progress both socially and behaviorally. BB participated in sports such as lacrosse and soccer for the first time ever. (T:1363,1415, 1416). BB completed several hours of Community Service. Tr. 1559. At home, his Parents noticed a dramatic improvement in BB's executive functioning skills. Tr. 1561. Finally, BB has even envisioned a plan to go onto higher education. Tr. 1561-62.

### C. Gow Satisfies the Least Restrictive Environment ("LRE") Provisions of IDEA

The Court in *Warren G. v. Cumberland County School District*, 190 F.3d 80, 84 (3d Cir., 1999) held that an appropriate private placement is not disqualified because it is a more restrictive environment than the public placement. The consideration of whether a child is being educated in the LRE is not to be done in a vacuum, but instead it is necessary to consider LRE consistent with the child's unique needs. *See Walczak,* 142 F.3d at 122; *Mrs. B. v. Milford Bd. Of Educ.*, 103 F. 3d 1114, 1122 (2d Cir. 1997).

Here, the nature of BB's disability and needs rendered it impossible for him to be educated satisfactorily in a mainstream environment. Being a residential program, Gow is in line with the most critical of Dr. Thomas' recommendations (PSUF ¶¶ 105-104-106). Indeed, "some children's disabilities may indeed be so acute as to require that they be educated in residential facilities." *Walczak,* 142 F.3d at 13; *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F. 3d 1493, 1500 (9th Cir. 1996) ("residential placement is appropriate for a disabled child if necessary for her to receive benefit from her education"). Rather than the mainstream program offered at BHCSD, the Gow environment allows students like BB the opportunity to acknowledge their disability, not feel ashamed of it, and move ahead in the treatment process (PSUF ¶ 117).

For these reasons, Gow was the appropriate placement for BB for the 2011-13 School Years.

## POINT III: THE EQUITIES FAVOR PLAINTIFFS

The equities favor the parents. Contrary to Defendant's assertions that, "Parents, who at every step thwarted the District's attempts to work with BB should not at this date be able to claim the equities in their favor to support their claim for reimbursement." (Dkt 33, p. 23) Here, Plaintiffs maintain that they did try to actively participate and cooperate with the District in developing the IEP. Moreover, it was Defendants, who purposefully antagonized Plaintiffs and not the other way around.

Here, Plaintiffs were active participants in BB's educational process. Plaintiffs provided all reports and documentation, attended all CSE meetings, communicated with administrators on a regular basis as reflected throughout the record, provided consent for evaluations and observations and informed BHCSD of BB's work with his private tutor (PSUF ¶ 122). In no way did Plaintiffs predetermine to send BB to Gow (PSUF ¶ 1224). Petitioners sent an official notice to BHCSD in dated August 17, 2011, received by their office on August 22, 2011, stating that they were withdrawing BB from BHCSD (D-23); *see R.B. et al v. NYC Dep't. of Educ.*, 713 F. Supp. 2d 235, 248 (S.D.N.Y. 2009). The idea of notice was intended to provide a school district the ability to provide FAPE. However, BHCSD never engaged in that process. *See S.W., et al. v. NYC Dep't. of Educ.*, 646 F. Supp. 2d 346, 361, (S.D.N.Y. 2009).

In fact, BHCSD falsely and maliciously reported plaintiffs to CPS on June 21, 2012. The timing of this report was suspicious and retaliatory, as it was made two weeks after Plaintiffs expressed their concerns with the program BHCSD offer for BB for the 2012-13 school year.

BHCSD's malicious and false reporting of Plaintiffs is the antithesis of what the balancing of cooperation stands for.[10]

Defendant also claims that Plaintiffs "removed" BB from public school before the annual CSE meeting in May and June 2012 (D MSJ MOL, p. 39), citing paperwork for BB's application and acceptance to Gow. Defendant's claim that Plaintiffs actually removed BB from BHCSD before the annual CSE meeting is misleading and egregiously incorrect. Plaintiffs did not remove BB from school, they simply filed paperwork with Gow to secure a position for BB for the 2012-2013 school year in the event they decided against the CSE's recommendations so they did not lose their spot (T: 2724). However, Plaintiffs had not made their placement decision yet. After BB was accepted to Gow in May 2012, Plaintiffs continued to consider BHCSD's recommendations (D-64, p. 2, T:2725).

The fact that Plaintiffs strongly advocated their position that BHCSD provide BB with an appropriate education does not mean they were uncooperative in their efforts to secure FAPE for BB *See*. *E.S.*, 742 F. Supp. 2d at 445. In balancing the equities, Plaintiffs have met her burden of equitable considerations, and have satisfied the reimbursement test. *Burlington*, 471 U.S at 370.

### POINT IV: PARENT'S SPOLIATION ARGUMENT IS RELEVANT

The Second Circuit and New York courts have long recognized, and imposed sanctions in connection with, actions relating to the destruction of evidence. *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999). Here, BHCSD spoliated documents regarding BB, in contravention of 8 NCYRR 185.12 (Appendix I [Schedule ED-1] at pp. 100-01[1.(267)(b)]. The District's spoliation of records is a serious procedural violation that, taken together with other violations committed by BHCSD, amounts to a denial of FAPE. *See Winkelman*, at 525-526.

---

10 Petitioners Due Process Demand, September 19, 2012, Addendum ¶¶ 48-54; 57-58; 73.

Specifically, BHCSD destroyed, or allowed to be destroyed, BB's Progress Chart. SD 44. Tr. 424-25. These Charts were used to document BB's progress in terms of his work and to plan for BB's personalized curriculum. Tr. 430. As BB's teachers shredded documentation, these documents could not be shared by teachers from one school year to the next. BHCSD's actions contravene Schedule ED-1, "Student Information Sheet" and "Student Progress Reports."

Moreover, BHCSD's counsel purposely failed to disclose the complete hearing record to the Office of State Review upon Plaintiffs' initiation of the appeal to the SRO, as required by law. *See* 8 NYCRR 279.2(a). BHCSD's counsel intentionally left out exhibits that were a part of the hearing record in an attempt to hold back information regarding BHCSD's retaliatory CPS report. The SRO specifically reprimanded BHCSD, stating that " I remind the district of its obligation to maintain "a true and complete copy of the hearing record" before the IHO and for submission to the Office of State Review (8 NYCRR 200.5[j][3][v], [5][vi]; 279.9)" SRO p. 5, fn 8. BHCSD's documented wrongdoings demonstrate their willingness to engage in the spoliation of evidence.

## V. CONCLUSION

Plaintiffs respectfully request that the SRO decision be reversed in its entirety and a finding that BHCSD failed to offer BB a FAPE for the 2011-12 and 2012-13 school years; that Gow is an appropriate placement for BB; that Plaintiffs are entitled to compensatory education for BB for the 2011-13 school year; that Plaintiffs are entitled to reimbursement for tuition paid to Gow on behalf of BB for the 2012-13 school year; and, as the prevailing party, leave to apply for an award of attorney's fees and costs, and such other and further relief this Court finds just and proper.

Dated: April 1, 2016
       Katonah, NY

Peter D. Hoffman, Esq.  (PH-8306)
LAW OFFICE OF PETER D. HOFFMAN, P.C.
Attorneys for Plaintiffs
200 Katonah Avenue
Katonah, NY 10536

Yifei He, Esq.  (YH-9382)
LAW OFFICE OF PETER D. HOFFMAN, P.C.
Attorneys for Plaintiffs
200 Katonah Avenue
Katonah, NY 10536